JOURNAL ENTRY AND OPINION
{¶ 1} Trentina Perry ("Perry") appeals various decisions of the trial court regarding the admission of testimony and evidence in her medical malpractice trial against Dr. Dinesh Manilal Shah ("Dr. Shah") and University Hospitals of Cleveland ("UH"). For the reasons adduced below, we reverse and remand for a new trial. The following facts give rise to this appeal.
 {¶ 2} Perry's pregnancy was managed by Dr. Charles R. Cowap ("Dr. Cowap"), a family practice resident at UH. Perry's expected delivery date was on or about May 5, 2000. Perry did not progress in her pregnancy in terms of her cervix ripening for a vaginal birth. After her due date, Perry went to UH every few days to be evaluated. On May 12, 2000, Dr. Cowap sent Perry to Dr. Shah to conduct various measurements using an ultrasound machine. Dr. Shah, an obstetrician gynecologist and maternal fetal medicine specialist, was not an employee of UH.
 {¶ 3} One of the tests Dr. Shah performed on Perry was a biophysical profile ("BPP") test. The BPP is a four-component ultrasound test which examines the following: (1) fetal breathing, (2) fetal movement, (3) fetal tone, and (4) amniotic fluid. The test is scored by assigning a value of zero to two for each component, and then adding the values for a maximum possible score of eight. If one of the factors is not good and results in a low score, there is a possibility the baby could suffer adverse consequences.
 {¶ 4} In determining the amount of amniotic fluid for the BPP, two methods are used: (1) scanning the uterus for a two centimeter by two centimeter pocket of fluid ("two-by-two pocket test"), or (2) dividing the uterus into four quadrants, scanning each quadrant for the deepest pocket of fluid, adding the four measurements and obtaining the amniotic fluid index ("AFI test"). Both of these tests for measuring amniotic fluid were performed by Dr. Shah on Perry.
 {¶ 5} Under the AFI test, a finding of less than 50 millimeters (mm) of amniotic fluid indicates a condition of low amniotic fluid known as oligohydramnios. Perry's expert, Dr. Michael Cardwell ("Dr. Cardwell"), testified that if there is decreased amniotic fluid there is an increased chance of an umbilical cord accident. The AFI test performed on Perry indicated 44 mm of amniotic fluid. As a result, the BPP report printed from the ultrasound machine indicated the presence of oligohydramnios.
 {¶ 6} Under the two-by-two pocket test, a pocket that is two centimeters deep and two centimeters wide is within normal limits. Dr. Shah determined he had identified and measured a two-by-two pocket. As a result, Perry was given a score of two on this component and her final BPP score was 8 out of 8 points. However, Dr. Cardwell testified Dr. Shah did not do the two-by-two pocket measurement appropriately because he did not do a perpendicular measurement at a right angle. Dr. Cardwell's opinion was that Perry's baby should have been delivered on May 12.
 {¶ 7} Dr. Cowap testified that on May 12 he learned the result of the BPP was within normal limits. Dr. Cowap, however, never saw the written report and was not aware of anything concerning the BPP.
 {¶ 8} Further, although Dr. Cowap was aware that Perry had ogligohydramnios during a prior pregnancy, which resulted in a C-section, he did not recall being aware of the condition with this pregnancy. Dr. Cowap had never managed any patients with oligohydramnios. However, he was aware that in certain situations the condition could indicate prompt delivery. Dr. Cowap testified that had he read oligohydramnios on the report, he would have brought it to the attention of his "attending" to see if there was any concern.
 {¶ 9} Dr. Cardwell testified that Perry was not an adequate candidate for a natural birth and that she should have been scheduled for a C-section at 38 to 39 weeks. However, Dr. Cowap never recommended to Perry that she have a C-section.
 {¶ 10} Dr. Cowap next saw Perry on May 15, 2000. Dr. Cowap ordered a non-stress test and an amniotic fluid check. This time, Dr. Richard Hassan Beigi ("Dr. Beigi"), a resident in the maternal-fetal medicine department at UH, performed an ultrasound that measured Perry's amniotic fluid level in each quadrant of the uterus. Dr. Beigi did not document the amniotic fluid level on Perry's medical chart. Despite the fact that the AFI test performed by Dr. Shah had indicated 44 mm of amniotic fluid, Dr. Beigi testified at trial that he recalled the total fluid level measurement of the amniotic fluid was 75 mm. Dr. Cardwell testified that the trend is for amniotic fluid to decrease, not increase, post-term. Further, there were no recordings in the protocol to confirm this measurement. However, U.H.'s expert, Dr. Harland Giles, attributed the increase in the amniotic fluid level between May 12, 2000 and May 15, 2000 to the fact that the baby had not "voided" at the time of the May 12, 2000 reading.[1]
 {¶ 11} Dr. Beigi also testified that after performing this test he referred to a chart affixed to the ultrasound machine to determine if the measurement was within normal limits and concluded that it was. The non-stress test performed on Perry was "reactive" which was good. Dr. Cowap learned the results of both tests were normal on the same day they were performed.
 {¶ 12} Dr. Cowap told Perry to come back on May 18, three days later. On that date, Perry's unborn child died in utero from a cord accident and was delivered stillborn.
 {¶ 13} Dr. Cardwell testified that the care given to Perry did not meet the standard of care and that the management of her pregnancy and decision to attempt a vaginal birth, despite her prior C-section, was the cause of her baby's death. He testified that this tragedy was predictable:
{¶ 14} "It was predictable because, first off, Trentina shouldhave been delivered by repeat C-section because of her riskfactors. Second off, barring that, we have on May 12th,ultrasound findings of oligohydramnios, which is a bad sign,which is predictable of certain complications including cordaccidents; and had the doctors acted within the standard of careon that day, the baby would have been delivered in a healthycondition."
 {¶ 15} Perry filed a medical malpractice action against Dr. Shah and UH.[2] The claims against UH were brought under the doctrine of respondeat superior for the alleged negligence of Dr. Cowap, Dr. Shah, and Dr. Beigi. The parties later stipulated that Dr. Cowap and Dr. Beigi were employees of UH working within the scope of their employment while treating Perry and that UH could be held vicariously liable for their actions. The case against UH proceeded under a theory of vicarious liability only as to these two doctors. The case proceeded as to Dr. Shah, who was not an employee of UH, individually for his alleged negligence.
 {¶ 16} On the second day of trial, Perry presented the testimony of Dr. Cardwell, who testified to mistakes made in obtaining measurements of Perry's amniotic fluid. Dr. Cardwell was cross-examined concerning a reproduced ultrasound image that Dr. Shah had created with his attorney and another person. Dr. Shah later testified that the "image" was created by downloading an analog still image from the VHS videotape of the ultrasound to a computer hard drive, recalling the image, now in digital format, to the screen, performing a calibration of the image, and superimposing calipers (cursors) over the re-created image to perform the measurement. Perry referred to this as an "electronically manipulated ultrasound image."
 {¶ 17} Dr. Shah used an enlarged version of the image at trial; however, neither counsel nor the court identified the enlarged image with a letter or number for the record. The record indicates this was an enlarged image of exhibit 2. Dr. Shah's exhibit 2 was a small, index-card-size print of the computer generated image.
 {¶ 18} Perry objected to the use of the enlarged image during Dr. Cardwell's cross-examination and, later, she objected to the admission of exhibit 2. Both objections were overruled.
 {¶ 19} Later in Dr. Cardwell's cross-examination, Dr. Shah questioned Dr. Cardwell regarding 18-year-old allegations of misconduct arising from a dispute with a former employer. Perry's objections to this line of questioning were overruled.
 {¶ 20} Following that line of questioning, Dr. Shah questioned Dr. Cardwell about two exhibits, which were letters written by Perry's previous attorney to Dr. Shah's current attorney. Perry objected to this line of questioning, arguing that Dr. Cardwell had no personal knowledge of these letters. Perry's objection was overruled.
 {¶ 21} During the defense case, Dr. Shah testified he had made his amniotic fluid measurements correctly. He supported his testimony with the enlarged image that he created, which was the same exhibit first used against Dr. Cardwell.
 {¶ 22} UH presented the testimony of Dr. Beigi, who testified he measured Perry's amniotic fluid and it was within normal limits. Perry attempted to cross-examine Dr. Beigi using a textbook by Creasy and Resnik. The chart Dr. Beigi relied upon while measuring Perry's amniotic fluid was published in the Creasy and Resnik textbook, as well as in other places. Dr. Shah's objection to this line of questioning was sustained.
 {¶ 23} At the conclusion of trial, the jury returned a verdict in favor of Dr. Shah and UH. Perry filed this appeal, advancing four assignments of error. Perry's first assignment of error reads as follows:
 {¶ 24} "The trial court abused its discretion when it admitted into evidence an electronically manipulated ultrasound image, when that image was unaccompanied by an expert report or expert testimony, was created during trial and was never identified as an exhibit prior to trial."
 {¶ 25} It is well established that a trial court has broad discretion in the admission or exclusion of evidence, and so long as such discretion is exercised in line with the rules of procedure and evidence, its judgment will not be reversed absent a clear showing of an abuse of discretion with attendant material prejudice. Rigby v. Lake Cty. (1991), 58 Ohio St.3d 269, 271. The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219. Moreover, error predicated on an evidentiary ruling does not warrant reversal of the trial court's judgment unless the court's actions were inconsistent with substantial justice and affected the substantial rights of the parties. Evid.R. 103(A); Civ.R. 61.
 {¶ 26} The central factor in our analysis is that the exhibit was not disclosed to Perry prior to trial.[3]
 {¶ 27} Perry asserts the trial court erred in admitting the exhibit since it was not disclosed prior to trial during the discovery process. Civ.R. 26(A) reads:
{¶ 28} "It is the policy of these rules (1) to preserve theright of attorneys to prepare cases for trial with that degree ofprivacy necessary to encourage them to prepare their casesthoroughly and to investigate not only the favorable but theunfavorable aspects of such cases and (2) to prevent an attorneyfrom taking undue advantage of his adversary's industry orefforts."
 {¶ 29} The civil rules were designed to provide for full discovery of all pertinent nonpriviledged evidence and to allow both parties to accurately assess the merits of their case prior to trial. Lin v. Khan (May 3, 1994), Franklin App. No. 93APE09-1252. Furthermore, the civil rules are intended to eliminate surprise and prevent a "trial by ambush." Id.; Jonesv. Murphy (1984), 12 Ohio St.3d 84, 86. The exhibit in this case was an electronically manufactured image that Dr. Shah did not present until the time of trial.[4]
 {¶ 30} Our analysis must consider the impact of the exhibit on the overall trial and whether admitting the exhibit, without prior disclosure, was harmless or unfairly prejudiced Perry's substantial rights. "Generally, in order to find that substantial justice has been done to an appellant so as to prevent reversal of a judgment for errors occurring at the trial, the reviewing court must not only weigh the prejudicial effect of those errors but also determine that, if those errors had not occurred, the jury or other trier of the facts would probably have made the same decision." Cappara v. Schibley, 85 Ohio St.3d 403, 408; 1999-Ohio-278, quoting Hallworth v. Republic Steel Corp.
(1950), 153 Ohio St. 349, paragraph three of the syllabus.
 {¶ 31} In this case Dr. Shah used the exhibit to perform a remeasurement of the amniotic fluid pocket depicted in the exhibit by inserting perpendicular calipers onto the image. This made the exhibit a critical piece of evidence that went to the heart of Perry's claim. The use of the exhibit to remeasure the amniotic fluid level was significant because Dr. Shah admitted that the calipers present in the original ultrasound image were not perpendicular and it was disputed whether a valid two-by-two pocket measurement could be made without perpendicular calipers. Dr. Shah testified that his remeasurement, using the previously undisclosed image, now with the imposed perpendicular calipers, established that the two-by-two pocket he found contained a normal amount of amniotic fluid.
 {¶ 32} Because the accuracy of this measurement is calculated in centimeters, the perpendicular calipers inserted onto the image to conduct the remeasurement produced critical evidence in the case. Perry should have been afforded the opportunity to review the exhibit prior to trial and provided the chance to conduct her own analysis, or to prepare a defense to the remeasurement claims of Dr. Shah. However, Perry never saw the exhibit prior to trial and could not have anticipated its use or prepared to refute its conclusions with her own expert medical testimony. The jury was left to merely accept Dr. Shah's assertion that the remeasurement performed with the aid of the inserted calipers produced an accurate result, without an effective challenge from Perry. Perry was denied an opportunity to examine the image and effectively question its authenticity and reliability.
 {¶ 33} As Perry was clearly prejudiced and her substantial rights were impacted by the admission of this exhibit, we find the trial court abused its discretion in permitting Dr. Shah to utilize the exhibit and in admitting the exhibit into evidence.
 {¶ 34} Perry's first assignment of error is sustained.
 {¶ 35} Perry's second assignment of error is as follows:
 {¶ 36} "The trial court abused its discretion when it permitted defense counsel to cross-examine appellant's expert witness regarding extremely prejudicial false allegations of misconduct with no evidence to support such accusations."
 {¶ 37} The trial court permitted Dr. Shah, over Perry's objection, to cross-examine Perry's expert witness, Dr. Cardwell, regarding allegations made against Dr. Cardwell in connection with his departure from a previous employer 18 years prior to the trial. "All relevant evidence is admissible * * *. Evidence which is not relevant is not admissible." Evid.R. 402.
 {¶ 38} To counter what he called Dr. Cardwell's mischaracterization, Dr. Shah asked Dr. Cardwell a series of questions implying that Dr. Cardwell's true reason for leaving his former employer was to avoid confronting allegations of drug abuse and mental incompetence. Dr. Cardwell denied the allegations were his reason for leaving his former employer. These allegations were contained solely in the wording of questions put to Dr. Cardwell by Dr. Shah. No evidence was admitted or even offered to substantiate these allegations. In fact, following Dr. Cardwell's denial of truth of these allegations, Dr. Shah failed to provide any connection between the allegations and Dr. Cardwell's expert opinion or his methods used to arrive at his expert opinion. Unproven, unsubstantiated allegations made close in time to Dr. Cardwell's departure from his former employer do not impeach his response that the sole reason he left that employer was his wife's desire to move south.
 {¶ 39} Dr. Shah argues the fact that "Cardwell admitted the accusations were made confirms counsel's good faith belief that the questioning was proper." Admitting these unsubstantiated accusations "were made" is not equivalent to admitting they are true or that they represent the real motivation for Dr. Cardwell's decision to leave that employer.
 {¶ 40} Even probative evidence must be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." Evid.R. 403(A). We find that the trial court abused its discretion in permitting this line of questioning as the record reveals that it produced evidence of meager, if any, probative value that was substantially outweighed by its unfair prejudice. Perry's second assignment of error is sustained.
 {¶ 41} Perry's third assignment of error is as follows:
 {¶ 42} "The trial court erred when it permitted defense counsel to cross-examine appellant's expert witness regarding a letter written by appellant's prior counsel to the defense counsel when the witness was not a party to the correspondence and had no knowledge of what was in the mind of appellant's prior counsel when the letter was written."
 {¶ 43} Dr. Shah was permitted to cross-examine Dr. Cardwell regarding the text of two letters that were not written by Dr. Cardwell, that were not sent to Dr. Cardwell, and that were not sent by Dr. Cardwell or on his behalf. Evid.R. 602 precludes a witness from testifying "to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter." Dr. Cardwell had no personal knowledge about the contents of these exhibits or the motivation of Perry's prior counsel in choosing the words she chose. In addition, the letters constituted hearsay.
 {¶ 44} Evid.R. 801(A) reads in pertinent part:
{¶ 45} "(A) Statement. A `statement' is (1) an oral orwritten assertion * * *.
 {¶ 46} "* * *
 {¶ 47} "(C) Hearsay. `Hearsay' is a statement, other than onemade by the declarant while testifying at the trial or hearing,offered in evidence to prove the truth of the matter asserted."
 {¶ 48} Dr. Shah defends the use of the letters as follows:
 {¶ 49} "Implicit in Appellant's former counsel's letter is the possibility that she had spoken to Dr. Cardwell regarding his opinions concerning Dr. Shah and that she had no reason tobelieve she had a basis to continue the case against him. * * * Thus, the suggestions presented by the attorney's letters were an appropriate starting point for Dr. Shah to challenge the genuineness of Dr. Cardwell's opinions * * *."
 {¶ 50} (Emphasis added.)
 {¶ 51} Evid.R. 803 contains various exceptions to the hearsay rule, none of which apply to Dr. Shah's use of these letters in cross-examining Dr. Cardwell. In addition, Dr. Shah's argument that he is entitled to question Dr. Cardwell about "implications" regarding a "possibility" that Perry's former attorney had spoken to Dr. Cardwell regarding his opinions and that she had no reason to believe she could continue the case against Dr. Shah is beyond tenuous.
 {¶ 52} We find the trial court abused its discretion in permitting the cross-examination of Dr. Cardwell using these inadmissible hearsay exhibits of which Dr. Cardwell had no personal knowledge. It was, therefore, error to permit Dr. Shah to question Dr. Cardwell about these exhibits. See Bianchi v.Paliga (Dec. 11, 1984), Mahoning App. No. 84 C.A. 37. Perry's third assignment of error is sustained.
 {¶ 53} Perry's fourth assignment of error is as follows:
 {¶ 54} "The trial court erred when it failed to allow appellant to cross-examine a key defense witness with a learned treatise when the foundation for the treatise had already been laid pursuant to evidence rule 706 and when the defense witness relied on a chart from the same treatise containing an explanation crucial to appellant's claim."
 {¶ 55} After performing an ultrasound on May 15, 2000, Dr. Beigi referred to a chart affixed to the ultrasound machine to determine if the amniotic fluid measurement he had just made was within normal limits. Dr. Beigi testified the measurement he made was 75 mm. Dr. Beigi then used the chart to determine 75 mm was within normal limits. Perry established this chart was printed in a textbook on maternal-fetal medicine authored by Creasy and Resnik. Perry attempted to cross-examine Dr. Beigi about information on a page in Creasy and Resnik, adjacent to the chart, which she claimed discussed the meaning of the chart. Dr. Shah's objection to the use of this textbook was sustained.
 {¶ 56} Perry argues the trial court should have permitted her to cross-examine Dr. Beigi with text from the Creasy and Resnik book that allegedly supported the conclusion that, even at the amniotic fluid level of 75 mm, oligohydramnios was still present and required prompt intervention and delivery. Perry relies upon Evid.R. 106 and Evid.R. 706 in making her argument.
 {¶ 57} Evid.R. 106 provides that, when a party introduces a writing or part thereof, the other party "may require him at that time to introduce any other part * * * which is otherwise admissible and which ought in fairness to be considered contemporaneously with it." Evid.R. 106 is known as the rule of completeness. The rule permits a party against whom the writing is offered to require that the adverse party introduce any otherwise admissible part of the writing which ought in fairness to be considered by the jury at the same time. State v. Barna
(Nov. 3, 1993), Lorain App. No. 93CA005564. The overriding purpose of the rule is to prevent adverse parties from taking statements or writings out of context and distorting them. Id.;State v. Byrd, Lorain App. No. 03CA008230, 2003-Ohio-7168. Furthermore, Evid.R. 106 is considered a rule of timing because it allows the adverse party to immediately put the admitted statements into context by permitting him to simultaneously admit the remainder of the writing. State v. Byrd, supra.
 {¶ 58} In this case, the chart was not used out of context. The chart was used by Dr. Beigi to determine whether Perry's amniotic fluid level fell within normal limits. The entire chart was introduced. The text found in the Creasy and Resnik book that Perry sought to introduce was not required to establish what normal limits were on the chart. Therefore, the additional part was not something which, in fairness, was required to be considered contemporaneously with the chart.
 {¶ 59} Evid.R. 706 reads, in pertinent part:
{¶ 60} "Statements contained in published treatises * * * onthe subject of * * * medicine * * * are admissible forimpeachment if the publication is either of the following: 1.Relied upon by an expert witness in reaching an opinion; 2.Established as reliable authority (1) by the testimony oradmission of the witness, (2) by other expert testimony, * * *."
 {¶ 61} The chart in question concerned a subject of medicine, and Dr. Beigi relied upon the chart in reaching his opinion that Perry's amniotic fluid was within normal limits. However, contrary to Perry's contention, the transcript does not clearly reflect that Dr. Cardwell identified the Creasy and Resnik book as reliable authority. The only text in the portion of the transcript to which Perry refers is William's Obstetrics. Further, despite Perry's so-called proffer to the court, Dr. Cardwell's testimony speaks for itself on this matter.
 {¶ 62} Nevertheless, even if the Creasy and Resnik book had been properly established as reliable authority, it nonetheless was not admissible for the purpose of which Perry sought to introduce the text. Evid.R. 706 clearly states that any statements from learned treatises can only be admitted for impeachment purposes, and therefore may not be used substantively in a case. Mack v. Krebs, Lorain App. No. 02CA008203, 2003-Ohio-5359.
 {¶ 63} Dr. Beigi's testimony in this case was that 75 mm fell within normal limits for the gestational age of the fetus. He testified that the number fell within the 5th to 50th percentile at 41 weeks pregnancy pursuant to the chart affixed to the ultrasound machine. Dr. Beigi stated that this indicated to him that Perry had adequate fluid volume. Dr. Beigi also confirmed that he was unaware of what the cutoff for oligohydramnios was at 41 weeks.
 {¶ 64} Perry's use of the Creasy and Resnik book was not to impeach Dr. Beigi's testimony concerning his reading of the chart or his finding that 75 mm fell within normal limits on the chart. Rather, Perry sought to introduce the text as substantive evidence to establish that 75 mm of amniotic fluid was indicative of oligohydramnios.
 {¶ 65} We find the trial court did not abuse its discretion in prohibiting use of the Creasy and Resnik text to cross-examine Dr. Beigi. Perry's fourth assignment of error is overruled.
 {¶ 66} As a final matter, we must address the issues of harmless error raised by the parties as they pertain to the first three assignments of error, which we have sustained.
 {¶ 67} A court's error may be considered harmless only if its commission did not prevent substantial justice or does not affect the substantial rights of the parties. Civ.R. 61; Cappara v.Schibley, 85 Ohio St.3d 403, 408; 1999-Ohio-278. "Generally, in order to find that substantial justice has been done to an appellant so as to prevent reversal of a judgment for errors occurring at the trial, the reviewing court must not only weigh the prejudicial effect of those errors but also determine that, if those errors had not occurred, the jury or other trier of the facts would probably have made the same decision." Cappara,85 Ohio St.3d at 408, quoting Hallworth v. Republic Steel Corp.
(1950), 153 Ohio St. 349, paragraph three of the syllabus.
 {¶ 68} In this case, Dr. Shah claims that Perry was not prejudiced by the introduction of the electronically manipulated image of the ultrasound and any error in its introduction was harmless. Dr. Shah also claims that Perry was not prejudiced by the introduction of the other disputed evidence. UH argues that the disputed image was not mentioned or relied upon by UH and Dr. Shah's use of the exhibit did not affect the outcome of the case against UH at trial. UH makes the same argument with respect to Dr. Shah's use of the letters written by Perry's prior counsel to cross-examine Dr. Cardwell.
 {¶ 69} Perry responds that Dr. Shah and UH used the same expert and presented a united front against her. She argues that the credibility of her expert, Dr. Cardwell, was placed in question by the improper questioning regarding drug abuse allegations against him and by the use of prior counsel's letters reflecting an intent to dismiss Dr. Shah. Perry also claims that the use of the image, which was not disclosed or provided prior to trial, was prejudicial. Perry states the image was a critical piece of evidence in the case and the use of the image affected the jurors' view of Dr. Shah and how UH should have proceeded with the pregnancy. As Perry states in her reply brief, "[t]he image was at the heart of Dr. Shah's defense. As such, it also affected how the jury perceived UH's role in Ms. Perry's pre-natal care given that such care was based on Dr. Shah's ultrasound reading."
 {¶ 70} We agree with Perry. Had the court's errors not occurred, the jurors may have reached a different decision with respect to the negligence claim against Dr. Shah and the claims against UH under the doctrine of respondeat superior for the actions of Dr. Cowap and Dr. Beigi. While UH did not directly rely upon the improper evidence, the evidence nonetheless prejudiced Perry's case against UH. The evidence used to discredit Dr. Cardwell may have affected the jurors' view of Dr. Cardwell's testimony as it related to both Dr. Shah and UH.
 {¶ 71} Further, the use of the image without disclosing it to Perry was highly prejudicial to Perry's case against both defendants. The measurement or mismeasurement of Perry's amniotic fluid levels was at the center of this case. The image was used as evidence that a proper measurement was made by Dr. Shah. Not only could this have affected the jurors' views of Perry's claim of negligence against Dr. Shah, but also it may well have affected the jurors' views concerning the negligence of Dr. Cowap and Dr. Beigi in their management and treatment of Perry's pregnancy as it related to the claims brought against UH. Indeed, if the jurors relied on this evidence to establish an accurate measurement was taken and the amniotic fluid levels were normal, the jurors may have found in favor of UH as a result. If the evidentiary error had not occurred, the jurors may have reached other conclusions regarding Dr. Cowap's management of Perry's pregnancy and inquiries into her test results. Therefore, substantial justice was not done and we do not find the errors were harmless.
 {¶ 72} We recognize that Dr. Cowap and Dr. Beigi were voluntarily dismissed from this action; however, their dismissal does not impact the claims against UH. The claims against UH were based on the doctrine of respondeat superior, under which the hospital could be held liable for injuries caused by the negligence of its employees. Although Perry was required to prove the negligence of the doctors to prevail on her claims against UH, she could do so without the doctors being present in the action. Indeed, we have previously held that there is no requirement that an employee be named as a party in a suit in order to prove his negligent acts. Krause v. Case WesternReserve University (Dec. 19, 1996), Cuyahoga App. No. 70712.
 {¶ 73} We recognize that a third person must be able to maintain a negligence action against an employee in order to bring an action against the employer. Where no claim can be maintained, an action against the employer is extinguished. Thus, in situations where an employee has been voluntarily dismissed with prejudice, where there has been an adjudication on the merits, or where an employee's negligence is nonexistent or not established, a claim against an employer under respondeat superior must fail. See Id.; Cully v. St. Augustine Manor (Apr. 20, 1995), Cuyahoga App. No. 67601; Docemo v. National RailroadPassenger Corp. (May 9, 1996), N.D. Ill. Case No. 9564062.
 {¶ 74} In this case, since Dr. Cowap and Dr. Beigi were voluntarily dismissed without prejudice and were not necessary parties to the action, Perry was entitled to proceed on her claims against UH. As outlined in the facts herein, evidence was presented upon which the jurors could find that Dr. Cowap and Dr. Beigi failed to meet the standard of care and UH could be held liable. Since the jurors may have reached a different conclusion as to all defendants had the court's errors not occurred, the entire case must be remanded for a new trial.
 {¶ 75} Judgment reversed and case remanded for a new trial.
 {¶ 76} MICHAEL J. CORRIGAN, A.J., CONCURRING IN PART AND DISSENTING IN PART:
 {¶ 77} While I concur with the lead opinion in its analysis of appellant's fourth assignment of error, I respectfully dissent from the lead opinion and would affirm the jury verdicts in favor of UH and Dr. Shah. It should be noted that the lead opinion has not commanded a majority of this court; therefore, any statements made in the lead opinion's analysis of the case are purely dicta and not the law of this court.
 {¶ 78} Had the lead opinion received a majority of this court, its analysis of Perry's assignments of error one through three is misplaced. First, there can be no vicarious liability imputed to UH because Dr. Shah was not a UH employee. In addition, while I agree with the lead opinion that an employer may not be held vicariously liable under respondeat superior where an employee's negligence is nonexistent or not established, I fail to see how the parties' stipulation in voluntarily dismissing Dr. Cowap and Dr. Beigi, both UH employees, from the case without prejudice changes this time-honored tenet of law. Either Dr. Cowap or Dr. Beigi had to have been found negligent by the jury to impute such liability to its employer, UH. Neither were found negligent in their care of Perry and, as a result, UH cannot be vicariously liable for its employees' "non-negligence."[5]
 {¶ 79} Second, although the lead opinion states that Dr. Shah's use of an "enlarged version" of Perry's May 12, 2000 ultrasound unfairly prejudiced Perry because it was not disclosed prior to trial, it is not unusual nor a novelty to have an exhibit enlarged or blown-up for the purposes of presenting it to the jury as a visual aid. As the lead opinion concedes, the enlarged version of the subject ultrasound was simply an enlargement of Exhibit 2, which was admitted into evidence and is the size of an index card of the computer generated ultrasound image. The enlarged version was not admitted into evidence and was not made part of the record for our review. Because the enlarged version of Exhibit 2 is not part of our record, this court is unable to review its contents and "[t]his fact, in and of itself, precludes [Perry] from demonstrating prejudice on this record" simply because the enlarged version was not disclosed to Perry prior to trial. Industrial Recycling Servs., Inc. v.Rudner, Stark App. No. 2001CA00329, 2002-Ohio-4068, ¶ 30.
 {¶ 80} Moreover, it is unfathomable to believe that the nondisclosure prior to trial of the enlarged version of Exhibit 2 unfairly prejudiced Perry when Perry's own medical expert presumably reviewed the results of the May 12, 2000 ultrasound in preparing his expert report and in opining that the "ultrasound findings of oligohydramnios . . . is predictable of certain complications including cord accidents; and had the doctors acted within the standard of care on that day the baby would have been delivered in a healthy condition." Being forever mindful of the trial court's broad discretion in admitting evidence, the trial court did not abuse its discretion in allowing Dr. Shah to use the enlarged version — essentially a visual aid — of Exhibit 2.
 {¶ 81} Third, there is nothing in the record to suggest that the cross-examination of Dr. Cardwell was improper, as raised in Perry's second assignment of error. In fact, the questioning of a previously-filed lawsuit, a matter of public record, was opened by Dr. Cardwell himself when he claimed that the only reason he left Rockford Memorial Hospital was because his wife wanted to move south. This equivocation strategically leaves out the subsequent litigation filed by Dr. Cardwell and the implication that, in fact, his resignation from Rockford Memorial Hospital was anything but voluntary. Since Dr. Cardwell was testifying on behalf of Perry, opining that Dr. Shah and UH acted negligently and caused the wrongful death of Perry's stillborn son, his credibility is an issue with which defense counsel may question in accordance with the Rules of Evidence. Because it cannot be said that the trial court abused its discretion in allowing the limited cross-examination of Dr. Cardwell, I would overrule this assignment of error.
 {¶ 82} Finally, with respect to Perry's third assignment of error, Dr. Cardwell was not questioned on the letter written by Perry's former counsel to defense counsel to prove the truth of the matter asserted, which is that Perry was anticipating dismissing Dr. Shah from the case. Instead, Dr. Cardwell was asked about the letter to learn whether he made representations about his opinion of Dr. Shah that would have led Perry's former counsel to believe she had no viable claim against Dr. Shah. It is immaterial that Dr. Cardwell had no personal knowledge of the letter as he was not asked to authenticate it, but rather to address whether he gave any impressions in his opinion which may have accounted for Perry's former counsel to seriously consider dismissing Dr. Shah. There is nothing to suggest that the trial court abused its discretion in allowing Dr. Cardwell to be cross-examined on the letter, nor is there anything to suggest that such questioning prejudiced Perry's case.
 {¶ 83} Because the trial court did not abuse its discretion in the evidentiary disputes, I would affirm the jury verdicts in favor of UH and Dr. Shah.
This cause is reversed and remanded to the lower court for further proceedings consistent with this opinion.
It is, therefore, considered that said appellant recover of said appellees costs herein.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Dyke, J., concurs in judgment only; Corrigan, A.J., concurs inpart and dissents in part. (See separate concurring anddissenting opinion.)
See App.R. 22(B), 22(D) and 26(A); Loc.App.R. 22. This decision will be journalized and will become the judgment and order of the court pursuant to App.R. 22(E) unless a motion for reconsideration with supporting brief, per App.R. 26(A), is filed within ten (10) days of the announcement of the court's decision. The time period for review by the Supreme Court of Ohio shall begin to run upon the journalization of this court's announcement of decision by the clerk per App.R. 22(E). See, also S.Ct.Prac.R. II, Section 2(A)(1).
[1] The testimony indicated amniotic fluid is primarily composed of fetal urine and fluid secreting from the membranes. Fluid volume may change if a baby has "voided" just prior to the measurements.
[2] In the complaint, Perry also named the following defendants who were later voluntarily dismissed: Charles R. Cowap, M.D.; University Hospitals Health System MacDonald Imaging; University Hospitals of Cleveland University MacDonald Women's Hospital; and Richard Hassan Beigi, M.D.
[3] While the appellant captions the first assignment of error under a view that expert testimony is required to authenticate and admit the exhibit in question, we need not decide this case in that context. We are cognizant that there are few cases in Ohio, or in other jurisdictions, that have definitively addressed the admission of evidence created by a computer, and are further cautioned by the reality that the technology involved in creating such evidence is ever changing.
[4] Under the circumstances of this case, the trial court could evaluate a challenge to the authenticity, reliability and admissibility of the exhibit utilizing Evid.R. 901(A), 901(B)(9), 104(A) and 104(B), after a determination that nondisclosure of the exhibit to Perry did not unfairly prejudice her substantial rights.
[5] The lead opinion states that "evidence was presented upon which the jurors could find that Dr. Cowap and Dr. Beigi failed to meet the standard of care and UH could be liable." This statement, coupled with the judgment to reverse and remand for a new trial, suggests that the lead opinion believes that the manifest weight of the evidence does not support the jury's verdict that Dr. Shah and UH were not negligent in their care of Perry. If the lead opinion's judgment is truly an attempt to reverse the jury verdict on the weight of the evidence, such judgment must have the concurrence of "all three judges hearing the cause." See Section 3(B)(3), Article IV, Ohio Constitution. Because the lead opinion does not have the concurrence of all three judges, its reversal on the weight of the evidence is unconstitutional.