[Cite as *Branch v. Cleveland Clinic Found.*, 2011-Ohio-3975.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 95475**

# MARGARET BRANCH, ET AL.

PLAINTIFFS-APPELLANTS

vs.

# CLEVELAND CLINIC FOUNDATION

DEFENDANT-APPELLEE

## JUDGMENT:
## REVERSED AND REMANDED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-696928

**BEFORE:** Keough, J., Cooney, P.J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:** August 11, 2011

**ATTORNEYS FOR APPELLANTS**

Paul W. Flowers
Paul W. Flowers Co., LPA
Terminal Tower, 35th Floor
50 Public Square
Cleveland, OH 44113

Michael F. Becker
The Becker Law Firm, LPA
134 Middle Avenue
Elyria, OH 44035

John F. Romano
The Romano Law Group
P.O. Box 21349
West Palm Beach, FL 33416

**ATTORNEYS FOR APPELLEES**

Anna M. Carulas
Ingrid Kinkopf-Zajac
Douglas G. Leak
Roetzel & Andress, LPA
1375 East Ninth Street
One Cleveland Center, 9th Floor
Cleveland, OH 44114

KATHLEEN ANN KEOUGH, J.:

{¶ 1} Plaintiffs-appellants, Margaret and Turner Branch, appeal from the trial court's judgment in favor of the Cleveland Clinic Foundation (the "Clinic") on Branch's medical malpractice claim. For the reasons that follow, we reverse and remand for a new trial.

**I.      Procedural History**

**{¶ 2}**   Branch and her husband refiled their medical malpractice claim against the Clinic in 2009[1] alleging that Branch had suffered a severe brain hemorrhage and stroke during deep brain stimulation (DBS) surgery at the Clinic in February 2007.   They asserted claims for medical negligence, lack of informed consent, negligent credentialing, and loss of consortium.   They subsequently dismissed their claims for loss of consortium (effectively dismissing Branch's husband as a party to the suit), negligent credentialing, and lack of informed consent (in part).[2]   Branch's remaining claims proceeded to a jury trial.   After a two-week trial, the jury returned a unanimous defense verdict.   In response to an interrogatory, the jury indicated that the Clinic had complied with the standard of care that was owed to Branch.

## II.    The Trial

**{¶ 3}**   The evidence at trial demonstrated that Branch and her husband own the Branch Law Firm in Albuquerque, New Mexico, and in the 1980s and 1990s, Branch was an extremely successful plaintiff's lawyer.   She suffered from numerous medical conditions for years, however, including chronic neck and back pain and depression. The evidence was disputed regarding how much Branch was still working prior to her

---

[1]Their first complaint was filed in January 2008 and subsequently dismissed without prejudice.

[2]Branch withdrew that part of the lack of informed consent claim that alleged    the Clinic had failed to disclose and/or misrepresented the risk of bleeding during the surgery; she specifically retained that portion of the claim that alleged the Clinic's doctors had misrepresented their experience, success rate, and the doctors who would be participating in Branch's actual surgery.

surgery. Although Branch testified that she was still working approximately 30 hours per week prior to her surgery, medical records indicated that she had told several doctors that she was no longer working as of 2005.

{¶ 4} In 2005, Branch developed cervical dystonia, a neurological condition that caused the muscles in her neck to retract in a manner that forced her head into a downward position. The dystonia exacerbated Branch's depression, causing her to abuse pain medications and attempt suicide.

{¶ 5} In November 2006, Branch was evaluated at the Clinic for DBS surgery for her cervical dystonia. She and her husband met with Dr. Benjamin Walter, a Clinic neurologist specializing in movement disorders, and neurologist Dr. Jerrold L. Vitek. They also met with Clinic neurosurgeon Dr. Andre Machado, who was just finishing his first year as an attending neurosurgeon. Dr. Machado determined that Branch was a potential candidate for DBS surgery. He testified that he discussed the risks and benefits of, and alternatives to, DBS surgery with Branch and her husband that day. The Branches were also given a 10-page document entitled "The Cleveland Clinic Foundation Consent to Participate in a Humanitarian Use Device Therapy," which explained in detail the nature of the DBS procedure and that there were a number of potential complications with the procedure, including "paralysis, coma and/or death" and "bleeding inside the brain (stroke)." On February 15, 2007, Branch signed the consent form acknowledging the potential risks.

{¶ 6} To provide relief from dystonia, the neurosurgeon must access the globus

pallidus internus (GPI), the area of the brain responsible for sending the abnormal impulses that cause the dystonia, and place bilateral electrodes on both sides of the GPI. After the electrodes have been successfully planted, they are programmed to send impulses that relieve the dystonia.

{¶ 7} To reach the GPI, the neurosurgeon drills a burr hole in the top of the patient's skull above the ear. A small tube, known as a cannula, is slowly passed through the brain and towards the GPI. Once the target has been reached, the stylette inside the cannula is removed and an electrode is passed through the cannula and placed at the appropriate spot. The cannula is then removed from the patient's head and the process is repeated on the other side of the skull.

{¶ 8} Prior to surgery, the neurosurgeon must develop a detailed target plan to determine the location of the GPI, the proper placement of the burr holes, and the trajectory paths of the cannulas. To develop his target plan, Dr. Machado used a complex computer software program that fused the magnetic resonance imaging (MRI) and computer tomographic (CT) scans of Branch's head into a single three-dimensional image. From this fused image, Dr. Machado obtained a "probe's eye view" of Branch's brain to develop the target plan. Dr. Machado testified that he plotted a trajectory that was designed to avoid Branch's lateral ventricle.

{¶ 9} During the procedure on February 19, 2007, Dr. Machado drilled the right and left burr holes for Branch's DBS procedure without incident. He inserted three cannulas through the burr hole on the left side, using the predetermined targets, and then

sucessfully inserted a microelectrode. Dr. Machado then proceeded to the right side. A cannula was inserted through the burr hole but Branch's blood pressure dramatically increased and Dr. Machado saw blood coming out of the cannula. The procedure was aborted, but the bleeding was substantial and Branch suffered a stroke that caused significant subsequent neurological deficits during the bleed.

{¶ 10} Branch's expert, Dr. Robert S. Bakos, concluded that Dr. Machado had misplaced the right-side burr hole, misdirected the cannula off its intended trajectory, and breached the lateral ventricle, causing Branch's stroke. Dr. Machado agreed at trial that he would have been off the planned target course if he had pierced the ventricle wall during the procedure, but insisted that had not happened.

{¶ 11} Following the surgery, Branch was hospitalized in the Clinic's intensive care unit for several weeks. One side of her body was paralyzed and she was barely able to speak. She was subsequently transferred to a hospital in Houston, Texas, where Dr. Stanley Fisher, her treating neurologist, confirmed that Branch had suffered a bleed in the right basal ganglia and right lateral ventricle. Dr. Fisher testified that Branch suffered a "significant and permanent injury" due to the bleed and that she "will never be able to function independently."

III. Life Care Planning and Economic Expert Testimony

{¶ 12} Branch called Carroll Highland, a life care planner, and Robert Johnson, an economic expert, to testify regarding her future economic damages. In her first assignment of error, Branch contends that the trial court erred in striking Highland's

testimony on the ground that it was based on hearsay. In her second assignment of error, she contends that the trial court erred in prohibiting Johnson from testifying as a sanction for an alleged discovery violation.

{¶ 13} The jury found no negligence by the Clinic and thus did not consider the issues of either proximate cause or damages. As Highland and Johnson's testimony related only to damages, an issue the jury did not reach, even if this court were to find error in the exclusion of their testimony, any error was harmless.

{¶ 14} Branch's first and second assignments of error are therefore overruled.

## IV. The Clinic's Eleventh-Hour Disclosure of its Computer Re-creation

{¶ 15} Branch's expert, Dr. Robert Bakos, testified at trial that Dr. Machado deviated from the standard of care because he breached Branch's right ventricle with the cannula. Dr. Bakos opined that Dr. Machado placed the right side burr hole too medially and was off the intended trajectory when he breached the ventricle wall. During his testimony, Dr. Bakos used a two-dimensional computer animation to demonstrate how proper target planning of Branch's procedure could have avoided the ventricle wall, but he told the jury several times that what they were viewing "[was] not Margaret Branch" nor an actual "probe's eye view" of her brain.

{¶ 16} Dr. Machado had conceded earlier in the trial[3] that despite the bleed, neither the fused image of Branch's brain nor the target planning data for her surgery had been retained by the Clinic following her surgery. But ten minutes before Dr. Machado

---

[3]Branch called Dr. Machado on cross-examination in her case-in-chief.

was to return to the stand as the final defense witness, defense counsel disclosed that a demonstration had been prepared during which Dr. Machado would re-create his target planning for Branch on a three-dimensional software system for the jury. Although the trial court initially sustained Branch's objection to the just-disclosed re-creation, the trial court reversed its ruling and allowed the demonstration to procede.

{¶ 17} During the demonstration, Dr. Machado told the jury that they were viewing "a three-dimensional reconstruction of [Branch's] face with the head frame as it was placed in the very day of surgery" and that "all the films here belong to [Branch], the films that were used for her surgery." Using data from his operative notes and a newly-created fused image of Branch's brain, Dr. Machado showed the jury the trajectory he had allegedly taken during Branch's procedure.

{¶ 18} In her third assignment of error, Branch contends that the trial court erred in allowing Dr. Machado to perform the computer re-creation because it was disclosed to her only moments before Dr. Machado testified. We agree.

{¶ 19} It is well established that a trial court has broad discretion in the admission or exclusion of evidence. *Rigby v. Lake Cty.* (1991), 58 Ohio St.3d 269, 271, 569 N.E.2d 1056. So long as the discretion is exercised in accord with the rules of procedure and evidence, an appellate court will not reverse absent a clear showing of an abuse of discretion with attendant material prejudice. Id. "Moreover, error predicated on an evidentiary ruling does not warrant reversal of the trial court's judgment unless the court's actions were inconsistent with substantial justice and affected the substantial

rights of the parties." *Perry v. Univ. Hosps. of Cleveland*, Cuyahoga App. No. 83034, 2004-Ohio-4098, ¶25, citing Evid.R. 103(A); Civ.R. 61.

{¶ 20} "'Generally, in order to find that substantial justice has been done to an appellant so as to prevent reversal of a judgment for errors occurring at the trial, the reviewing court must not only weigh the prejudicial effect of those errors but also determine that, if those errors had not occurrred, the jury or other trier of the facts would probably have made the same decision.'" Id., at ¶30, quoting *Cappara v. Schibley*, 85 Ohio St.3d 403, 408, 1999-Ohio-278, 709 N.E.2d 117.

{¶ 21} Prior to opening arguments in this case, the trial judge made it a point to confirm that the parties had shared their demonstrative exhibits with each other. Branch shared her animation with defense counsel at the beginning of trial on July 1, 2010. Branch's counsel even agreed to email the animation to defense counsel. The animation was later used by Dr. Bakos during his testimony. Defense counsel did not cross-examine Dr. Bakos until the morning of July 8, 2010, a full week after she had been allowed to review Branch's demonstrative exhibits. The record reflects that the Clinic used this time to prepare its expert, Dr. Starr, to criticize the animation during his testimony.

{¶ 22} But Branch was not afforded the same opportunity because the Clinic's computer re-creation was not disclosed until ten minutes before Dr. Machado testified. The Clinic offers no explanation as to why defense counsel waited until the morning of July 13, 2010 before disclosing that Dr. Machado would use a computer re-creation while testifying that morning. It is apparent, however, that defense counsel knew of the

re-creation well before the morning of Dr. Machado's testimony and failed to disclose it. During opening argument, defense counsel told the jury that "Dr. Machado will tell you in this particular case he did not go through the ventricle and *he will reconstruct it for you and show you* exactly based on all this how it didn't go through the ventricle." (Emphasis added.) Just before Dr. Machado testified, when Branch's counsel and defense counsel were arguing about whether the Clinic's re-creation should be allowed, the trial judge asked defense counsel "How long have you guys been planning this? * * * You must have conceived this at some other time?" Defense counsel admitted, "I mean, sure." Thus, despite the Clinic's argument to the contrary, the re-creation was not a last-minute response to Dr. Bakos's in-court animation.

**{¶ 23}** Furthermore, despite the Clinic's assertion that Branch could have generated her own re-creation using Dr. Machado's operative notes, the re-creation could only be performed on the Clinic's three-dimensional "Stealth" software, to which Branch did not have access.

**{¶ 24}** This court considered an argument similar to that raised by Branch in *Perry*, supra. In *Perry*, the plaintiff alleged that her doctor had mishandled critical ultrasound measurements of her amniotic fluid and precipitated a stillborn delivery. During trial, the defendant doctor used a previously undisclosed exhibit to remeasure the amniotic fluid. Id., ¶31. The doctor, with counsel, had downloaded an image from the appellant's original ultrasound and then superimposed calipers on the re-created image to perform the remeasurement. Id. Using the previously undisclosed image, the doctor testified that

his remeasurement established that the amniotic fluid pocket contained a normal amount of fluid.   Id.   The jury then returned a defense verdict.   Id., ¶23.

{¶ 25} On appeal, the plaintiff–appellant argued that the trial court had abused its discretion in admitting the undisclosed exhibit at trial.   This court reversed the judgment and ordered a new trial.   It stated:

{¶ 26} "*The central factor in our analysis is that the exhibit was not disclosed to [plaintiff] prior to trial. * * ** [T]he perpendicular calipers inserted onto the image to conduct the remeasurement produced critical evidence in the case. [Plaintiff] should have been afforded the opportunity to review the exhibit prior to trial and provided the chance to conduct her own analysis, or to prepare a defense to the remeasurement claims of [the doctor].   However, [plaintiff] never saw the exhibit prior to trial and could not have anticipated its use or prepared to refute its conclusions with her own expert medical testimony.   The jury was left to merely accept [the doctor's] assertion that the remeasurement performed with the aid of the inserted calipers produced an accurate result, without an effective challenge from [plaintiff]. [Plaintiff] was denied an opportunity to examine the image and effectively question its authenticity and reliability."
 Id., ¶26, 32.   (Emphasis added.)

{¶ 27} As in *Perry*, we find that the trial court's decision to allow the computer re-creation, despite the Clinic's failure to timely disclose it, prejudiced Branch and affected her substantial rights.   By waiting to disclose the computerized reconstruction until only a few minutes before Dr. Machado took the stand, the Clinic effectively

precluded Branch from scrutinizing the computerized reconstruction with her own experts, who had left Cleveland several days earlier, and preparing a proper cross-examination.

{¶ 28} As in *Perry*, the jury in this case was left to merely accept Dr. Machado's assertion that as demonstrated by the computer re-creation, he had followed a safe trajectory that avoided Branch's ventricle. The prejudicial impact of the computer re-creation was especially significant in light of testimony by the Clinic's expert, Dr. Phillip Starr, that without the target plan data, "elements" of the target plan could be reconstructed, "but the entire plan can't be." Dr. Starr, the only neurosurgeon called to testify in support of Dr. Machado, also refused to express any opinion as to whether the ventricle wall had been breached. But despite Dr. Starr's opinion to the contrary, Dr. Machado testified that using the three-dimensional software system, he had, in fact, re-created the "probe's eye view" of precisely the same trajectory he had plotted through Branch's brain, a trajectory that not surprisingly completely avoided the ventricle. Because Branch was effectively precluded from scrutinizing the computerized reconstruction with her own experts, there was no meaningful way for her to dispute that Dr. Machado had just re-created for the jury what the Clinic's expert had testified could not be fully re-created. The prejudicial effect of Branch's inability to effectively challenge Dr. Machado's demonstration because of the Clinic's last-minute disclosure was magnified by the fact that the demonstration was the last piece of evidence the jury saw before deliberating.

{¶ 29} Further, although the Clinic argues that Dr. Machado's demonstration was "simply offered as an illustration for the jury," it is apparent that the re-creation was intended to give the jurors the impression that they were watching a virtual identical reconstruction of the procedure performed on Branch in 2007. But unlike as for Branch's animation, the Clinic was not required to inform the jurors that they were not actually watching a video of Branch's surgery. In fact, the judge told the jury that "Defendant intends at this time to reconstruct the target plan from Dr. Machado's operative notes," reinforcing the jury's misimpression that they were watching a reconstruction of the identical procedure performed on Branch three years earlier.

{¶ 30} Branch was clearly prejudiced and her substantial rights affected by the trial court's decision to allow the computer re-creation by Dr. Machado despite its eleventh-hour disclosure; accordingly, the trial court abused its discretion in allowing the re-creation.

{¶ 31} Branch's third assignment of error is therefore sustained.

## V. Directed Verdict on Branch's Claim for Lack of Informed Consent

{¶ 32} Count 2 of Branch's complaint sought damages under a theory of lack of informed consent. Prior to trial, she voluntarily withdrew that aspect of the claim pertaining to the disclosure of the risk of a hemorrhage during the DBS procedure. She reserved her right to pursue a recovery regarding the alleged failure to disclose the experience and qualifications of the Clinic's surgeons. Specifically, Branch alleged that she was misled as to Dr. Vitek's involvement in her surgery and that she was not

informed about Dr. Machado's qualifications or credentials. After the defense had rested, the trial judge granted a directed verdict on the remainder of Branch's informed consent claim. In her fourth assignment of error, Branch argues that the trial court erred in dismissing this aspect of her informed consent claim.

{¶ 33} Civ.R. 50 sets forth the standard for granting a motion for a directed verdict:

{¶ 34} "When a motion for directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

{¶ 35} A motion for a directed verdict tests the legal sufficiency of the evidence to take the case to the jury. "It is the duty of the court to submit an issue to the jury if there is sufficient evidence to permit reasonable minds to reach different conclusions on that issue; conversely, the court must withhold an issue from the jury when there is not sufficient evidence presented relating to the issue to permit reasonable minds to reach different conclusions." *Harris v. Mt. Sinai Med. Ctr.* (May 28, 1998), Cuyahoga App. No. 72668.

{¶ 36} A motion for directed verdict presents a question of law, not one of fact; hence, we employ a de novo standard of review in evaluating the grant or denial of a

motion for directed verdict. *Grau v. Kleinschmidt* (1987), 31 Ohio St.3d 84, 90, 509 N.E.2d 399.

{¶ 37} In *Nickell v. Gonzalez* (1985), 17 Ohio St.3d 136, 139, 477 N.E.2d 1145, the Ohio Supreme Court held that "[t]he tort of lack of informed consent is established when:

{¶ 38} "(a) The physician fails to disclose to the patient and discuss the material risks and dangers inherently and potentially involved with respect to the proposed therapy, if any;

{¶ 39} "(b) the unrevealed risks and dangers which should have been disclosed by the physician actually materialize and are the proximate cause of the injury to the patient; and

{¶ 40} "(c) a reasonable person in the position of the patient would have decided against the therapy had the material risks and dangers inherent and incidental to treatment been disclosed to him or her prior to the therapy."

{¶ 41} To prevail on a claim for lack of informed consent, medical expert testimony is necessary to establish the significant risks of the proposed treatment or procedure that should have been disclosed. *Ratcliffe v. Univ. Hosps. of Cleveland* (Mar. 11, 1993), Cuyahoga App. No. 61791. See, also, *Bedel v. Univ. OB/GYN Assoc., Inc.* (1991), 76 Ohio App.3d 742, 744, 603 N.E.2d 342.

{¶ 42} Branch contends that the trial court erred in granting the motion for directed verdict on her lack of informed consent claim because the evidence showed that both she

and her husband were under the impression that Dr. Vitek would be handling her DBS procedure. Further, they wanted someone who was experienced in this procedure, and did not want anyone performing the surgery who was not board certified. Instead, Dr. Machado, who had been an attending neurosurgeon for only a year and had handled only between five to ten dystonia cases, and who was not eligible for board certification in the United States because he had received his medical training in Brazil, performed the procedure. Dr. Machado testified that he could not recall what he had told Branch and her husband regarding his training or experience. In light of this evidence, Branch contends that there was a legitimate factual dispute over her claim of informed consent that precluded a directed verdict.

{¶ 43} Branch's argument fails because she presented no testimony as to the third prong of the *Nickell* test: that a reasonable person in Branch's position would have decided against DBS surgery had she been informed of Dr. Machado's qualifications or that Dr. Walter, instead of Dr. Vitek, would perform the microelectrode recording during her surgery. Further, the testimony was clear that Branch and her husband were determined to have Branch's surgery performed at the Clinic. Accordingly, the trial court did not err in entering a directed verdict on Branch's lack of informed consent claim.

{¶ 44} Branch's fourth assignment of error is overruled.

## VI. A "Different Methods" Instruction

{¶ 45} As part of their proposed jury instructions, the Clinic requested that the

court charge the jury on "different methods." Over Branch's objection, the jury was instructed as follows:

**{¶ 46}** "Although some other healthcare provider might have used a method of diagnosis, or treatment, medication, or procedure different from that used by Dr. Machado, this circumstance will not by itself prove that the physician was negligent.

**{¶ 47}** "You should decide whether the methods of diagnosis, treatment, and procedure used in this case were in accordance with the standard of care."

**{¶ 48}** In her fifth assignment of error, Branch contends that the trial court erred in supplying the jury with this "different methods" instruction.

**{¶ 49}** Contrary to Branch's assertion that our review is de novo, it is well-established law that we review the trial court's choice of jury instructions under an abuse of discretion standard. *Fifth Third Bank v. Gen. Bag Corp.*, Cuyahoga App. No. 92793, 2010-Ohio-2086, ¶26, citing *State v. Wolons* (1989), 44 Ohio St.3d 64, 68, 541 N.E.2d 443. "Abuse of discretion" means that the court's decision was unreasonable, arbitrary, or unconscionable. Id.

**{¶ 50}** The "different methods" instruction informs the jury that alternative methods can be used and that the selection of one method over the other is not in and of itself negligence. *Pesek v. Univ. Neurologists Assoc., Inc.*, 87 Ohio St.3d 495, 498, 2000-Ohio-483, 721 N.E.2d 1011. But the charge is not appropriate in all medical malpractice cases. "By its very terms, in medical malpractice cases, the 'different methods' charge to the jury is appropriate only if there is evidence that more than one

method of diagnosis or treatment is acceptable for a particular medical condition." Id.

{¶ 51} Branch argues that the "different methods" instruction was erroneous because no testimony was offered that recognized alternative methods of treatment. Specifically, she contends that her theory of malpractice was that Dr. Machado deviated from the course he had plotted through her brain and ruptured the ventricle, and that "not a single witness testified that slicing into the highly vascular chamber was a viable option for performing the surgery in this particular instance." Therefore, she contends, by giving the "different methods" instruction, the trial court led the jurors to believe that violating the standard of care that had been established did not necessarily mean that negligence had occurred. We agree.

{¶ 52} The Clinic's expert, Dr. Starr, testified that although he generally tries to avoid the ventricle during DBS surgery, in some surgeries the surgeon must go through the ventricle in order to reach the target. Dr. Machado likewise acknowledged that sometimes the best approach in DBS surgery is to go through the ventricle. This would suggest that an alternative methods instruction was appropriate in this case. But Dr. Machado testified that the target plan he developed for Branch's procedure was to avoid the ventricle, and that if he did in fact hit Branch's ventricle during the procedure (which he denied), he was off his intended trajectory. Thus, as Dr. Machado admitted, there was only one acceptable method of properly performing Branch's procedure: reaching the GPI and inserting the microelectrodes without hitting the ventricle.

{¶ 53} The Clinic contends that the instruction was proper because Branch's

expert, Dr. Bakos, testified that, in medicine, there are different schools of thought as to how to perform surgery and acknowledged that his mapping strategy varies from that of Dr. Starr, the Clinic's expert.[4] But mapping strategy was not at issue in this case; Dr. Machado testified that his pre-operative mapping developed a trajectory that was designed to miss the ventricle. Hence, whether Dr. Bakos would have mapped out fewer tracks to the GPI than Dr. Machado did is irrelevant. Furthermore, Dr. Bakos's acknowledgement that that there are different schools of thought as to how to perform "surgery" did not relate to DBS surgery generally or Branch's procedure specifically.

{¶ 54} Thus, the trial court erred in giving the "different methods" instruction in this case. Because the instruction "'probably misled the jury in a matter substantially affecting the complaining party's substantial rights,'" *Pesek*, at 499, quoting *Becker v. Lake Cty. Mem. Hosp. W.* (1990), 53 Ohio St.3d 202, 208, 560 N.E.2d 165, a new trial is warranted.

{¶ 55} Branch's fifth assignment of error is sustained.

## VII.  Evidentiary Inference from Missing Evidence

{¶ 56} Throughout trial, Branch's counsel made much of the fact that Dr. Machado had not saved the fused image of Branch's brain with the target planning data on a computer disc, and argued that in all likelihood, the fused image and target planning data would have shown that Dr. Machado deviated from the course that he had plotted and

---

[4]Dr. Bakos's approach to DBS surgery is to do the least amount of tracks to the target as possible; other experts and institutions map out more tracks to the target.

breached the ventricle wall. Branch's counsel asserted, and at several points during trial the trial court agreed, that because that evidence was missing, the jury was entitled to draw an inference that the unsaved image and data would have been unfavorable to the Clinic.

{¶ 57} Near the end of his rebuttal argument in closing, Branch's counsel mentioned the "coincidence that the best piece of evidence as to what happened is missing." When defense counsel objected, the trial court sustained the objection, noting there was no evidence of "anything willful about the destruction of any documents," and instructed Branch's counsel to "avoid that topic." In her sixth assignment of error, Branch argues that the trial court erred in precluding counsel from arguing the inference.

{¶ 58} The determination of whether the bounds of permissible argument have been exceeded is within the trial court's discretion and will not be reversed absent an abuse of that discretion. *Pang v. Minch* (1990), 53 Ohio St.3d 186, 194, 559 N.E.2d 1313.

{¶ 59} This court recognized the negative inference that may be drawn from missing evidence in *Cherovsky v. St. Luke's Hosp. of Cleveland* (Dec. 14, 1995), Cuyahoga App. No. 68326, where it stated:

{¶ 60} "'The unexplained failure or refusal of a party to judicial proceedings to produce relevant and competent documentary evidence * * * which would tend to throw light on the issues authorizes, under certain circumstances, an inference or presumption unfavorable to such party.'" Id., quoting 31-A C.J.S. Evidence § 156(2) at pp. 401-402.

Continuing, the court explained that the inference is allowed when "there has been an actual suppression or withholding of the evidence; no unfavorable inference arises where the circumstances indicate that the document or article has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for * * *." Id.

{¶ 61} *Cherovsky* involved a medical malpractice claim and a spoliation claim based on missing biopsy slides of the plaintiff's lung. The trial court denied the plaintiff's request for a specific adverse inference jury instruction regarding the missing slides, but gave a general instruction on inferences. This court held, for various reasons not applicable to our discussion, that the trial court properly rejected the adverse inference jury instruction. Of note, however, is this court's recognition that a negative inference arose from the missing evidence and the importance this court placed on the opportunity for plaintiff's counsel to argue the negative inference during trial and in closing argument, even though the specific adverse inference instruction was not given. The court stated, "We are satisfied that the trial court gave an adequate general instruction on inferences which gave the plaintiff's counsel the leeway he needed to argue the negative inferences from the missing slides, while, at the same time, properly instructing the jury." Later, the court again stated, "[T]he trial court gave Ohio's standard permissive inference instruction which allowed plaintiff to argue all the adverse inferences she wished from the missing slide evidence. * * * Under this instruction, the jury was permitted but not required, to infer that the missing biopsy slides were unfavorable, i.e.,

did not show cancer." Id. See, also, *Simms Builders v. Liberty Insulation Co.* (Feb. 16, 1983), Warren App. No. 73 (no error in failing to give requested specific adverse inference instruction; inference is permissible and counsel appropriately drew that inference in closing argument for the jury's consideration); *Signs v. Ohio Dept. of Rehab. & Corr.* (Nov. 23, 1994), Franklin App. No. 94API05-628 (jury may draw inference that evidence would be unfavorable to party that fails to produce relevant evidence under the control of party without reasonable explanation).

{¶ 62} Here, the record reflects that although the trial court recognized several times during trial that the jury was entitled to draw a negative inference from the missing evidence, the judge abruptly prohibited Branch's counsel from arguing that inference to the jury during closing argument because there was no evidence the Clinic had willfully destroyed the evidence. But Branch was not required to demonstrate that the Clinic willfully destroyed the evidence to be entitled to the inference. In *Cherovsky*, this court found that there was "no evidence of intentional destruction or suppression of the slides," but nonetheless concluded that the plaintiff could argue the negative inference from the missing slides. Id. The court recognized that the inference is permissive and arises "where there is relevant evidence under the control of a party who fails to produce it without satisfactory explanation." *Cherovsky*, quoting *Signs*, supra.

{¶ 63} Here, the original fused image and target planning data were missing and, hence, Branch was entitled to argue the adverse inference to the jury. The jury was not required to accept the inference (Dr. Machado testified that the fused image and target

planning data are only kept in "rare instances") but Branch was entitled to argue it. By prohibiting counsel from discussing the missing image and target plan data, the trial court unjustly deprived Branch of the benefits of an inference that this court and others have long recognized. We hold, therefore, that the trial court abused its discretion and committed reversible error in precluding Branch's counsel from arguing the negative adverse inference in closing argument.

{¶ 64} Branch's sixth assignment of error is therefore sustained.

Reversed and remanded.

It is ordered that appellants recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

KATHLEEN ANN KEOUGH, JUDGE

SEAN C. GALLAGHER, J., CONCURS;
COLLEEN CONWAY COONEY, P.J., CONCURS IN PART
AND DISSENTS IN PART WITH SEPARATE OPINION.

COLLEEN CONWAY COONEY, J., CONCURRING IN PART AND DISSENTING IN PART:

{¶ 65} I concur in the majority's disposition on the first, second, and fourth

assignments of error. On the remaining assignments, however, I respectfully dissent. I would affirm the jury's verdict and specific finding that Dr. Machado did not deviate from the standard of care. The jury heard the Clinic's expert, Dr. Starr, testify that the brain is "a very vascular structure" with many blood vessels, some too small to be seen in an MRI. Dr. Starr also stated that it is not a deviation from the standard of care to hit the ventricle. The consent form for this procedure advises that stroke is a risk of the procedure.

{¶ 66} I find no error in the trial court's allowing the "attempted re-creation/illustration" that the Clinic indicated in its opening argument would be shown to the jury. Many motions in limine were filed in the instant case, but none related to this allegedly improper demonstration. Moreover, it was merely demonstrative evidence and not an actual exhibit that accompanied the jury into the deliberation room for further review, the situation presented in *Perry*. The fact that the Clinic's expert had stated it cannot be re-created lends further credence to the position it was only demonstrative. I find nothing prejudicial about the attempted re-creation/illustration.

{¶ 67} As Branch's trial counsel stated to the judge, "As long as you indicate that this is an attempt to re-create." (Tr. 1644.) The court complied with this request and instructed the jury that "this is an attempted simulation, or re-creation of the evidence." (Tr. 1656.)

{¶ 68} Branch's counsel knew from the Clinic's opening argument that Dr. Machado would "reconstruct" the procedure for the jury. Branch cannot now complain

that the reconstruction was not disclosed until just minutes before Dr. Machado testified.

{¶ 69} Moreover, I find no prejudice to Branch from the attempted re-creation. The critical testimony of the Clinic's expert, Dr. Starr, indicated that it is not a deviation from the standard of care to hit the ventricle. (Tr. 1152.) He also testified that, in his opinion, Branch had a basal ganglia hemorrhage and not a ventricle bleed. (Tr. 1230.) It was well within the province of the jury to believe this expert testimony.

{¶ 70} I also disagree with the majority's resolution of the fifth and sixth assignments of error. I would find no error in the court's "different methods" jury instruction since different mapping strategies were put forth by the expert witnesses.

{¶ 71} Moreover, I would affirm the court's rejection of the negative adverse inference argument. The majority's reliance on *Cherovsky v. St. Luke's Hosp. of Cleveland* (Dec. 14, 1995), Cuyahoga App. No. 68326, is misplaced. That case involved a claim for spoliation — missing biopsy slides. And this court found in *Cherovsky* that "the unexplained failure" to produce relevant evidence may justify the negative inference. In the instant case, there was no "unexplained failure" or refusal to produce evidence. The testimony of Dr. Starr and Dr. Machado established that this original fused image and target data are not ordinarily retained. This is a satisfactory explanation which was never rebutted by Branch's witnesses.

{¶ 72} Accordingly, I would affirm the jury's verdict.